UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| TIMOTHY H. ORR and MARIA ORR,<br>    Plaintiffs | CIVIL ACTION |
| | Case No. 3:02cv2165 (AVC) |
| V. | |
| ROYAL INDEMNITY COMPANY d/b/a<br>ROYAL & SUNALLIANCE,<br>    Defendant. | Jury Trial Demanded |
| | October 24, 2003 |

## FIRST AMENDED COMPLAINT

### BACKGROUND

1. Plaintiffs Timothy H. Orr and Maria Orr ("Orrs" or "Plaintiffs") are Connecticut residents with an address of 36 Old Norwalk Road, New Canaan, Connecticut ("Premises").

2. At all times relevant herein, Defendant Royal Indemnity Company d/b/a Royal & SunAlliance (now known as Axis Reinsurance Company) is a Delaware corporation doing business in Connecticut with an office at 9 Farm Springs Road, Farmington, Connecticut (collectively "Royal" or "Defendant").

3. On November 23, 2000, a chimney fire occurred at the Premises, causing substantial damage to the Premises itself and virtually all personal property located within the Premises.

4.  As soon as the fire was extinguished, Plaintiffs' contacted Royal, as the insurer under Plaintiffs' Homeowners Policy, Policy No. RKG 5716EE, dated April 11, 2000 ("Policy"), regarding the fire and the damages caused thereby.

5.  Almost a full week after the fire, and after several days of hired clean-up, Royal sent an insurance adjuster, Adam Kopchyak ("Kopchyak"), who was acting as the agent of Royal, to the Premises to inspect the damage.

6.  Upon their first meeting, the Orrs expressed to Kopchyak the fact that, so that any potential health hazard to their family could be avoided, their main concern was whether the fire had caused damage to the furnace liner, fireplace liner, chimney and/or roof.

7.  Although he assured the Orrs that they would be treated fairly under the Policy, Kopchyak stated that while the Orrs should have their roof and chimney inspected, Royal would not cover a camera inspection of the chimney.

8.  Despite this fact, the Orrs had a camera inspection of the chimney performed for safety reasons, and the videotape of the inspection showed longitudinal cracks consistent with sudden occurrence damage due to a chimney fire.

9.  This videotape inspection was later loaned to Kopchyak in good faith, yet despite many requests for its return, he nor anyone at Royal ever returned the videotape.

10. In the weeks following the fire, upon the express assurances of Kopchyak and Royal itself that the Orrs would be taken care of under the Policy, the Orrs moved their family into a hotel, stored their dogs in a kennel, and paid for virtually all necessary cleaning of the Premises, as well as all cleaning and replacement of all personal property, out of their own pockets.

11. Despite timely and orderly submittal to Royal of all receipts of such out of pocket replacement expenses, however, the Orrs were made to wait several weeks and sometimes months for any reimbursement, and such reimbursements would always represent only partial amounts owed the Orrs.

12. In late December of 2000, after his initial inspection, Kopchyak transmitted a letter to the Orrs stating that (i) in his estimation, he valued the total damage caused by the fire to be roughly $12,000.00, and (ii) any discrepancy with his estimation of the total claim must be submitted in writing to Royal within 30 days.

13. Despite being alarmed by Kopchyak's initial estimate, the Orrs were again assured by Royal that such initial estimate was standard in the claims process, and that the Orrs would be treated fairly and fully indemnified under the Policy.

14. As such, the Orrs relied upon these assurances and did as Royal and Kopchyak instructed.

15. Also in late December of 2000, the Orrs obtained several estimates for painting the interior of the Premises, with the middle-range of such estimates being approximately $13,000.00. Upon submitting such estimate to Kopchyak, despite the fact that Kopchyak had yet to have any professionals measure or even look at the Premises for an estimate on painting, Kopchyak declared that such estimate was much too high, and, therefore, Royal would not pay for it.

16. While the Orrs were perplexed by this response, they continued to expect that Royal would pay for such painting in a reasonable manner based upon the assurances that the Orrs had been given.

17. In early January of 2002, Kopchyak finally brought a professional to inspect the damage to the roof and chimney. Such inspection, however, was completely unprofessional, as only measurements of rooms and carpet samples were taken, and only upon the Orrs' insistence that the chimney itself be inspected did the professional look very briefly into the fireplace. The professional, however, refused to inspect the roof, and further refused to thoroughly inspect the fireplace for damage to the chimney.

18.  Also in early January of 2001, Kopchyak rejected a submitted bid for repairs to the chimney, despite the fact that such estimate was not the most expensive bid obtained by the Orrs, and the fact that the chimney company doing the repairs had promised to have the fireplace up and running with a new lining by the end of the month.

19.  Kopchyak also rejected an estimate submitted on replacement carpeting, again despite the fact that such estimate was not the most expensive bid obtained by the Orrs, and that such carpeting company was the same one that had installed the original carpeting in the Premises.

20.  Well into the claims process, not withstanding Royal's representations and assurances that the Orrs would be treated fairly, the Orrs began to recognize a pattern by Royal, and by Kopchyak on Royal's behalf, in that with every estimate for repair work that is obtained by the Orrs, even when the Orrs had made sure to find a reasonable estimate for such professionals in Fairfield County (where the Premises is located), Royal rejected the bids as too expensive and stated that it would not pay more than the "national average" for such work on a dwelling.

21.  Such was the position of Royal as to every reasonable estimate submitted by the Orrs, despite the fact that the standard of living in Fairfield County is far above that of the "national average," and the fact that nothing in the Policy limited repair work on the Premises to "national average" costs.

22. In mid-Januay of 2001, when the Orrs inquired as to whether he had included in a reimbursement check the extra cost of the wallpaper and specialty paintjob in the entrance to the Premises, Kopchyak became very upset, used profanity, and accused the Orrs of submitting bad faith claims to the insurance company.

23. Again, although alarmed and frustrated by the actions of Royal and Kopchyak, the Orrs continued to rely upon the representations and statements of Royal and Kopchyak that their claims would be treated fairly and their losses would be indemnified as long as they followed their instructions throughout the claims process.

24. At this point, however, the Orrs felt that hiring their own insurance adjuster to work along with Kopchyak might speed up the claims process, and therefore, on January 18, 2001, the Orrs hired Eric von Brauchitsch of New England Adjusters ("von Brauchitsch").

25. Upon their first meeting on or about February 14, 2001, Kopchyak told von Brauchitsch that he was not going to pay $100,000.00 on what he termed as a "simple puff-back," which statement suggested that, despite its obligations under the Policy, Royal had predetermined the amount which it planned to indemnify the Orrs regardless of the actual amount it would eventually take to fully repair and replace the Premises and the Orrs' personal property. The Orrs, however, discounted their concerns that Royal was acting in bad faith, and continued to rely upon Royal's original representations.

26.    Despite the fact that the Orrs preferred a local professional whom they knew and trusted to do the job quickly and correctly, on or about February 28, 2001, von Brauchitsch found a professional, Jonathan Hart ("Hart"), to repair the chimney at an estimate that Royal would agree to.

27.    Despite Hart's warning that draft and smoke problems may occur if he were to make the chimney smaller (due to the unconventional measurements of the chimney that was built in the 1920s), Royal insisted on such process, thus risking reconstruction and a much larger expense of time and money should such method create problems down the road.

28.    As such, in mid-March of 2001, the Orrs had von Brauchitsch make it clear to Royal that the Orrs would only agree to Royal's preferred method of construction on the chimney if Royal would in turn agree to cover a complete reconstruction of the fireplace and chimney should problems occur with Hart's initial repairs.

29.    In response, both Royal and Kopchyak told von Brauchitsch on several occasions that Royal would indeed cover a total reconstruction should problems occur with the initial repair work.

30.    The Orrs requested from Royal written confirmation that it would pay for a complete reconstruction should draft and/or smoke problems occur after Hart completed the

7

project to Royal's specifications, but after several months and several more requests by the Orrs for written confirmation of Royal's oral agreement, Royal failed to even furnish a written reply.

31.     In early August of 2001, feeling that the project could not be delayed any further despite not having Royal's agreement in writing, the Orrs relied upon Royal's oral promise and authorized Hart to begin work on the chimney.

32.     In September of 2001, upon completion of Hart's initial construction, the Orrs tested the fireplace, but the fireplace spit back heavy smoke and had a back-draft causing smoke and ash to spill all over the house. Upon immediately reporting the chimney problems to Hart, Hart instructed the Orrs to test it again in the colder weather, but when the Orrs re-tested in or about early November of 2001, the smoke and draft problems persisted.

33.     In mid-November of 2001, in an effort to forego any further major construction on their house (as the initial construction forced the entire Orr family to vacate the Premises for weeks on end), the Orrs paid for a Mason to extend the fireplace out and make the opening smaller in an attempt to lessen the smoke and draft. Such actions, however, were ineffective.

34.     In late November of 2001, the Orrs transmitted a letter to Royal expressing their extreme displeasure with the manner in which Royal and its agent, Kopchyak, had handled the entire claims process.

35. Royal responded by stating that, from that point on, all communications regarding the Orrs' claims must be directed to their attorneys, as all claims were now considered in dispute.

36. Upon making contact with counsel for Royal, the Orrs were instructed to provide a detailed accounting of all claims either pending reimbursement or yet to be submitted to Royal, at which time such claims would be examined in their entirety and a settlement figure would be discussed.

37. In mid-March of 2002, after several months of gathering all relevant information and documentation, including (i) all outstanding claims yet to be reimbursed, (ii) receipts for all claims yet to be submitted for reimbursement, and (iii) obtaining at least three estimates from different professionals for all repair work yet to be performed on the Premises (including the reconstruction of the chimney), the Orrs submitted a claims breakdown to Royal that totaled approximately $107,000.00.

38. As a further effort to reach a good faith settlement with Royal, the Orrs stated to Royal that, if the actual cost of all remaining repairs ended up being more than what had been estimated, the Orrs would be personally responsible for any overage.

39. In April of 2002, Royal responded that the Orrs' settlement figure was rejected, and that Royal would only agree to paying the Orrs the approximately $8,000.00 that it had maintained as a "holdback" on the Orrs' outstanding claims.

40.    Counsel for Royal then informed the Orrs that its offices had been authorized by Royal to accept service of any Complaint the Orrs may file against Royal regarding the foregoing events.

41.    It had then become undeniable to the Orrs that, despite the terms of the Policy, and the promises and assurances from Royal throughout the entire claims process that Royal would indemnify their losses as long as they did what Royal instructed them to, which representations the Orrs had relied upon throughout the entire process, Royal never intended to fulfill its obligations to the Orrs.

42.    Further, Royal's scheme to delay and frustrate the claims process, and to ultimately not cover the Orrs' losses caused by the fire, smoke and chemical dust, has caused severe damage to the Orrs. More particularly, the Orrs have not been reimbursed for out of pocket repair and replacement expenses, the Premises has not been restored into its pre-loss condition, and the effect of being abandoned by Royal and attempting to raise a family in a dwelling that is non-functional and incomplete has caused tremendous emotional stress and anxiety to the Orrs and their family.

## COUNTS

**COUNT ONE  (Breach of Contract)**

1-42.   Paragraphs 1 through 42 of the Background are incorporated herein as Paragraphs 1 through 42 of this Count One as if fully set forth herein.

43.   Under the Policy, Royal is obligated to indemnify all losses and to cover any repair or replacing cost caused by the fire at the Premises.

44.   Despite several demands for payment of all claims in this matter, however, Royal has refused to cover the Orrs' losses and costs.

45.   As such, Royal has breached its agreement with, and obligations owed to, Plaintiffs by making false representations to Plaintiffs, and by embarking on a scheme to frustrate and delay the claims process from the beginning.

46.   Plaintiffs have been damaged by Royal's breach, and as such, Royal is liable for damages caused thereby.

**COUNT TWO (Promissory Estoppel)**

1-42.   Paragraphs 1 through 42 of the Background are incorporated herein as Paragraphs 1 through 42 of this Count Two as if fully set forth herein.

43.   Plaintiffs relied on the representations and obligations of Royal under the Policy, and thus were induced into entering into the Policy with Royal, and paying the Policy premium to Royal, to Plaintiffs' detriment in that Plaintiffs have been denied the coverage that they are entitled to under the Policy.

44.   As such, Plaintiffs changed their position in reliance on the representations and obligations of Royal under the Policy, and have incurred damages as a result.

45.   Therefore, Royal is estopped from denying its obligations under the Policy to cover Plaintiffs' losses.

**COUNT THREE (Breach of Implied Contract)**

1-42.   Paragraphs 1 through 42 of the Background are incorporated herein as Paragraphs 1 through 42 of this Count Three as if fully set forth herein.

43.   Royal has an obligation to pay Plaintiffs' claims separate and distinct from its obligations created by the Policy, which obligation was created through the communications,

12

actions and conduct of the parties, including but not limited to Royal's direct oral promise to cover the total reconstruction of the fireplace and chimney should Hart's initial attempt not succeed.

44.    Plaintiffs and Royal had a meeting of the minds when Royal, by itself and through its agent, Kopchyak, agreed to repair and replace all damage caused by the fire, including but not limited to covering the reconstruction of the fireplace and chimney.

45.    Furthermore, consideration was given by Plaintiffs in exchange for the promises Royal made, which consideration included (i) paying for all out-of-pocket expenses in reliance on the promise of reimbursement from Royal, (ii) expending significant time and effort to supply Royal with several different estimates for all repair and replacement work during the claim process, and (iii) providing full access to their home and otherwise cooperating fully with all of Royal's directives during the claims process.

46.    By failing and refusing to pay the monies owed Plaintiffs, and further refusing to cover Plaintiffs' losses due to the fire, Royal has breached an implied contract with Plaintiff, and is liable for damages caused thereby.

## COUNT FOUR (Fraud)

1-42.  Paragraphs 1 through 42 of the Background are incorporated herein as Paragraphs 1 through 42 of this Count Four as if fully set forth herein.

43.  Royal made representations to Plaintiffs in the Policy, and by the representations and conduct of Royal, and Kopchyak as its agent, during the claims process, that it would repair and/or replace all damage caused by the fire.

44.  Further, during the claims process, Royal, and Kopchyak acting as Royal's agent, (i) failed to acknowledge and act with reasonable promptness upon communications with respect to claims, (ii) failed to implement reasonable standards for the prompt investigation of claims, (iii) did not attempt in good faith to effectuate prompt, fair and equitable settlements of claims, (iv) compelled the Orrs to institute litigation to recover amounts due under the Policy, (v) attempted to settle claims for less than the amount a reasonable person would believe he or she were entitled to under the Policy, (vi) transmitted "advances" of monies due the Orrs that were always less than the entire claim amounts due on claims had been submitted in a timely and orderly fashion, (vii) generally failed to settle claims in a prompt manner where liability was reasonably clear, and (viii) generally failed to provide a reasonable explanation for the denial of a claim, an estimate, or a compromise settlement.

45.  As demonstrated by such conduct, Royal never intended to fully indemnify Plaintiffs, and further, Royal intentionally delayed, frustrated and held up every step of the

claims process in an attempt to avoid its obligations to Plaintiffs under the Policy, and its obligations under the other representations it made during the claims process.

46.     Such false statements of Royal during the claims process constitute fraudulent misrepresentations, which Royal knew were false when making, and such were relied upon by Plaintiffs and induced Plaintiffs into transacting business with Royal and to perform their part of the bargain, all to Plaintiffs' detriment.

47.     Further, Royal's conduct and refusal to cover Plaintiffs for losses suffered as a result of the fire constitutes an intentional scheme to defraud Plaintiffs as the insured under the Policy.

48.     As such, Royal is liable for damages caused thereby.

**COUNT FIVE (Breach of the Implied Covenant of Good Faith and Fair Dealing)**

1-47.   Paragraphs 1 through 47 of Count Four are incorporated herein as Paragraphs 1 through 47 of this Count Five as if fully set forth herein.

48.     Royal owes Plaintiffs a separate duty, carried over from the Policy, which requires Royal to act in good faith when making representations in an agreement, yet Royal has failed to meet this obligation.

49.     The actions of Royal constitute immoral, unethical and bad faith conduct designed to mislead or deceive the Orrs for a dishonest purpose.

50.     Such conduct constitutes a breach of the implied covenant of good faith and fair dealing, and Royal is liable for damages caused thereby.

**COUNT SIX (CUTPA, §§ 42-110(a), et seq.)**

1-49.   Paragraphs 1 through 49 of Count Five are incorporated herein as Paragraphs 1 through 49 of this Count Six as if fully set forth herein.

50.     By its conduct, Royal has engaged in unfair insurance practices, such as those defined by Connecticut General Statutes § 38a-816(6), and prohibited by the Connecticut Unfair Insurance Practices Act (Connecticut General Statutes § 38a-815).

51.     Further, Royal has been accused of similar misconduct in processing many other claims, including but not limited to twenty-five (25) separate complaints to the Connecticut Insurance Department regarding Royal's homeowners insurance coverage since January of 2000, which include complaints of Royal's (i) claim procedures, (ii) unjustified refund delays, (iii) unjustified denial of claims, and (iv) unsatisfactory settlement procedures.

52. Royal has also been sued for breach of contract and/or bad faith many times in multiple jurisdictions over the past several years, including but not limited to suits brought in the (i) United States Court of Appeals – Fourth Circuit, Ninth Circuit, and Tenth Circuit, (ii) the United States District Court - Districts of Connecticut, Arizona, N.D. of Georgia, E.D. of Texas, and E.D. of Pennsylvania, as well as (iii) the Connecticut Superior Court.

53. Such conduct by Royal constitutes unfair and deceptive acts or practices in the conduct of commerce, which conduct has caused Plaintiffs substantial harm.

54. Further, Royal has engaged in unfair insurance practices with such frequency as to indicate a general business practice.

55. As such, Royal has committed a violation of the Connecticut Unfair Trade Practices Act (Connecticut General Statutes §§ 42-110(a), et seq.), and, therefore, is liable to Plaintiffs for damages caused thereby.

## COUNT SEVEN (Negligence)

1-42. Paragraphs 1 through 42 of the Background are incorporated herein as Paragraphs 1 through 42 of this Count Seven as if fully set forth herein.

43. As the insurer under the Policy, Royal owed a duty to the Orrs as the insured to indemnify them in the event of a fire at the Premises, and to repair and/or replace all that such fire had damaged.

44. Further, Royal owed a duty to the Orrs to provide an objective and competent investigation and evaluation of their claims.

45. By the foregoing conduct, however, Royal breached its duties to the Orrs, and such breach was the actual and proximate cause of the substantial damages suffered by Plaintiffs.

46. As such, Royal's conduct was negligent, and Royal is liable for the damages caused thereby.

WHEREFORE, Plaintiffs Timothy H. Orr and Maria Orr claim as follows against Defendant Royal Indemnity Company d/b/a Royal & SunAlliance:

1. Compensatory damages;

2. Punitive damages;

3. Prejudgment interest;

4. Attorneys' fees;

5. Costs; and

6. Such other relief that a court of law or equity may grant.

THE PLAINTIFFS,
TIMOTHY H. ORR and MARIA ORR

By: _____
Jeffrey M. McCormick (ct#21185)
Brendan J. O'Rourke (ct#00522)
O'ROURKE & ASSOCIATES, LLC
27 Pine Street
New Canaan, CT  06840
phone: (203) 966-6664


## CERTIFICATION

This is to certify that a copy of the foregoing was mailed via first class mail, postage prepaid, to counsel of record as listed below this 24th day of October, 2003.

*Jeffrey M. McCormick*

Kathleen A. St. Onge, Esq.
Halloran & Sage, LLP
One Goodwin Square
225 Asylum Street
Hartford, CT 06103